CASE NO. 3:21-00261-L

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

HIGHLAND CAPITAL MANAGEMENT LP

(Debtor)

THE DUGABOY INVESTMENT TRUST AND
GET GOOD NONEXEMPT TRUST

(Appellants)

v.

HIGHLAND CAPITAL MANAGEMENT LP

(Appellee)

Adversary proceeding on appeal from the United States Bankruptcy Court for the Northern
District of Texas, Dallas Division

**ORIGINAL APPELLANT BRIEF FILED ON BEHALF OF**
**THE DUGABOY INVESTMENT TRUST AND THE GET GOOD NONEXEMPT TRUST**

Filed by Heller, Draper & Horn, LLC
Douglas S. Draper
Leslie A. Collins
Michael E. Landis
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: (504) 299-3300
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: mlandis@hellerdraper.com

{00375667-1}

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, and without waiver of any defenses/objections that it may have, Defendants Dugaboy Investment Trust and the Get Good Nonexempt Trust ("<u>Appellants</u>") state as follows:

No publicly-held company owns 10% or more of the Dugaboy Investment Trust, nor does it have a parent corporation; and

No publicly-held company owns 10% or more of the Get Good Nonexempt Trust, nor does it have a parent corporation.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE ................................................................................. ii

TABLE OF CONTENTS.................................................................................... iii

TABLE OF AUTHORITIES ............................................................................. iv

JURISDICTIONAL STATEMENT ..................................................................1

**I.      STATEMENT OF ISSUES PRESENTED ON APPEAL** ......................................2

**II.     STATEMENT OF FACTS AND PROCEEDINGS BELOW** ..............................3

**III.    SUMMARY OF ARGUMENT** ....................................................................8

**IV.     ARGUMENT** ........................................................................................9

      A.      The Settlement Inflates HarbourVest's Probability of Success and Discounts the Debtor's Defenses ................................................9

      B.      The Settlement Constitutes an Impermissible Gerrymandering of the Debtor's Plan in an Attempt to Purchase Votes.................................13

      C.      There is Ambiguous (if any) Benefit to the Estate ...........................13

**V.      CONCLUSION** .................................................................................14

CERTIFICATE OF COMPLIANCE.................................................................16

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*In re Age Ref., Inc.*,
    801 F.3d 530 (5th Cir. 2015) ........................................................................................2

*In re Greystone III Joint Venture*,
    995 F.2d 1274 (5th Cir. 1991) ..............................................................................12, 13

*Highland Crusader Offshore Partners LP v. LifeCare Holdings Inc.*,
    377 F. App'x 422 (5th Cir. 2010).................................................................................11

*In re Jackson Brewing Co.*,
    624 F.2d 599 (5th Cir. 1980) .........................................................................................9

*Matter of Linn Energy, L.L.C.*,
    936 F.3d 334 (5th Cir. 2019) .........................................................................................2

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968).......................................................................................................9

*In re Roqumore*,
    393 B.R. 474 (Bankr. S.D. Tex. 2008) ...................................................................9, 13

*Shapiro v. JPMorgan Chase & Co.*,
    No. 11 CIV. 7961 CM, 2014 WL 1224666, at *9 (S.D.N.Y. Mar. 24, 2014) .......11, 12

### <u>STATUTES AND RULES</u>

11 U.S.C. § 510.........................................................................................................2, 7, 8, 11

11 U.S.C. § 1122.................................................................................................................12

28 U.S.C. § 158...................................................................................................................1

28 U.S.C. § 1334.................................................................................................................1

Fed. R. Bankr. P. 8012........................................................................................................ ii

Fed. R. Bankr. P. 9019.....................................................................................................2, 9

## JURISDICTIONAL STATEMENT

Appellants, Get Good Nonexempt Trust ("Get Good") and Dugaboy Investment Trust ("Dugaboy" and together with Get Good, "Appellants") file this original Appellants' Brief regarding their appeal from a final order issued by the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").  This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 158 & 1334 and Rules 8001 et. seq. of the Federal Rules of Bankruptcy Procedure.

I.        STATEMENT OF ISSUES PRESENTED ON APPEAL

1.        Whether the Bankruptcy Court erred in finding that granting the Debtor's Motion For Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [ROA Vol. 1, p. 348] (the "9019 Motion") and finding that the 9019 Motion was in the best interest of the Debtor's estate, its creditors and other parties in interest.

2.        Whether the Bankruptcy Court erred in finding that granting the 9019 Motion and approving the settlement agreement was fair and equitable.

3.        Whether the Court should approve the settlement wherein the Debtor acquired assets from the settling party and pursuant to Court authorization could place the assets to be acquired with Debtor funds outside of the estate.

4.        Whether the claim of Harbourvest 2017 Global Fund L.P., Harbourvest 2017 Global AIF L.P., Harbourvest Dover Street IX Investment L.P., HV International VIII Secondary L.P., Harbourvest Skew Base AIF L.P., And Harbourvest Partners L.P. should have been allowed in part as a general unsecured claim and should not have been subordinated to all unsecured creditors pursuant to 11 U.S.C. § 510 (b).

Issues 1 through 3 are all related to the Bankruptcy Court's approval of the 9019 Motion. The approval of a compromise under Rule 9019 is reviewable for a Bankruptcy Court's abuse of discretion.  *In re Age Ref., Inc.*, 801 F.3d 530, 539 (5th Cir. 2015).

Issue 4 relates to the subordination of a claim under section 510(b) of the Bankruptcy Code, it is a legal conclusion and is subject to *de novo* review by this Court. *Matter of Linn Energy, L.L.C.*, 936 F.3d 334, 340 (5th Cir. 2019).

## II.        STATEMENT OF FACTS AND PROCEEDINGS BELOW

On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS). On December 4, 2019, the venue of this case was transferred to the Bankruptcy Court for this District.

On July 16, 2020, the Bankruptcy Court entered an order authorizing the Debtor to employ James P. Seery, Jr. as Chief Executive Officer and Chief Restructuring Officer of the Debtor. Mr. Seery continues to act in that capacity.

On April 8, 2020, HarbourVest filed Proofs of Claim Numbers 143, 147, 149, 150, 153, and 154 [ROA Vol. 10, p. 2202–55] (collectively, the "HarbourVest Claims").

On July 30, 2020, the Debtor filed Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims [ROA Vol. 10, p. 2256–78] (the "Debtor Objection"), which contained an objection to the HarbourVest Claims.

On September 11, 2020, HarbourVest filed HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims [ROA Vol. 10, p. 2279–2307] (the "HarbourVest Response").

The HarbourVest Response spelled out the basis of its claims. In essence, the HarbourVest Claims arise out of a transaction wherein HarbourVest invested approximately $80 million in Highland CLO Funding, Ltd. ("HCLOF") as a 49.98% owner. CLO HoldCo, Ltd. ("CLO HoldCo") was a 49.02% owner in HCLOF. HCLOF was the successor to Acis Loan Funding, Ltd. ("Acis"). HCLOF managed several securities backed by collateralized loan obligations (the

"CLOs").  HarbourVest asserted that it was fraudulently induced into making the investment into HCLOF through misrepresentations and omissions on the part of the Debtor and that had it been properly informed of the true status of HCLOF, it never would have made the investment.  In all, the HarbourVest Claims seek $300 million consisting of treble damages for its $80 million initial investment in HCLOF and $15 million in legal fees expended by HCLOF.

On November 24, 2020, the Debtor, in its Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [ROA Vol. 13, pp. 2958–59], described its position relative to the HarbourVest Claim as follows:

> The Debtor intends to vigorously defend the HarbourVest Claims on various grounds … The HarbourVest Entities invested approximately $80,000,000.00 in HCLOF but seek an allowed claim in excess of 300 million dollars (after giving effect to treble damages for the alleged RICO violations).[1]

On December 23, 2020, just one month following the above statement in the Disclosure Statement, the Debtor filed a Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith. [ROA Vol. 2, p. 348]. The proposed settlement provides HarbourVest with the following:

a.    An allowed, general unsecured claim in the amount of $45,000,000.00 [ROA Vol. 2, p. 356]; and

b.    A $35,000,000 claim in Class 9 [ROA Vol. 2, p. 356].

An integral element of the settlement requires that HarbourVest will "support confirmation of the Debtor's Plan including, but not limited to, voting its claims in support of the Plan."  There were three separate provisions stating that HarbourVest would vote in favor of the Plan.  The

---

[1] Disclosure Statement at 30–31, ROA, Vol. 13, pp. 2958–59.

settlement also contains a provision that HarbourVest will transfer its entire interest in HCLOF to an entity to be designated by the Debtor.  It is unclear whether HarbourVest has a right to transfer the interest and, secondly, what the Debtor will do with the interest [ROA Vol. 2 p. 348].

In return for these concessions, the Debtor (or any entity it so desires) is to acquire all of HarbourVest's interest in HCLOF, which the Debtor asserts (without any explanation) is valued at $22 million.

The sole support for the Motion is the Declaration of John Morris [ROA Vol. 2, p. 364] which fails to account for the enormous change in the Debtor's position between November 24, 2020 when the Disclosure Statement was approved and December 23, 2020 when the Motion was filed, a period of just thirty (30) days.  The Declaration of John Morris also contains no information as to the potential cost of the litigation, whether HarbourVest can transfer the interest, or reasons as to why the settlement is beneficial to the estate.

The Debtor makes the assertion that the interest it is acquiring was worth $22 million as of December 1, 2020 without advising as to the basis for the valuation.  The Motion did not provide the Bankruptcy Court with any basis to evaluate the settlement.  Specifically, there was no information as to 1) how the asset being acquired is valued; 2) can the Debtor acquire the interest; and 3) how will the Debtor bring value to the estate in connection with the interest since the Debtor has discretion to place the assets wherever it wants.

On January 14, 2021, the Bankruptcy Court held an evidentiary hearing where the Court heard testimony from Mr. Seery on behalf of the Debtor and Michael Pugatch as the managing director of secondary investment for HarbourVest.

Mr. Seery, in his testimony, outlined the defenses that were considered by the Debtor to the HarbourVest Claims, which he described as "very significant defenses." [Transcript at p. 45,

ln. 11; ROA Vol. 9, p. 2073].   Initially, Seery conceded that the $15 million claim asserted by HarbourVest for unnecessary legal fees expended in the bankruptcy case of Acis Capital Management L.P. (the "Acis Bankruptcy") was a legitimate claim.  [Transcript at p. 45, lns. 12–23; ROA Vol. 9, p. 2073].   However, under cross-examination, he conceded that HarbourVest would only be entitled to its 49.98% share of those fees due to its 49.98% interest in HCLOF. Specifically, Seery stated: "Well, the vehicle lost the money.  HarbourVest owned 49.98 percent of it, and Highland controlled the rest.  So if you allocate it that way, I suppose that would be a – that's how you would divide it, in – roughly in half, yes."  [Transcript at p. 90, lns. 7–10; ROA Vol. 9, p. 2118].

As to other defenses to the HarbourVest Claims, Seery testified that the principal focus of the Debtor's defenses would be against the fraudulent inducement claims in that HarbourVest is a sophisticated investor and would not have reasonably relied on any failure of the Debtor to divulge any important information related to the CLOs.  As Seery put it:

> As I said, reasonable reliance, what was disclosed, lack of digging into the public record, because you don't have to go far on Google to find "fraud" within two words of "Highland," and the tremendous, you know, litigious nature of Highland.  You know, even at that point, when this investment was made, aside from Mr. Terry's arbitration, which by that point, at least by the time (inaudible) was public, there was, you know, significant public disclosure around the Credit Strat and the litigation, the Crusader litigation, the UBS litigation, the, gosh knows, the Daugherty litigation.
>
> So our defense was going to be that you should have figured this out, you're a sophisticated investor, and you should have been able to figure out that there was a significant risk that, with respect to Mr. Terry, that Mr. Dondero would not stop litigating and that those costs would put significant risk on the investment.[2]

---

[2] Transcript at pp. 46–47; ROA Vol. 9, pp. 2074–75.

However, Seery admits that he did little to no investigation as to the strength of the lack of reasonable reliance defense.  When questioned about the approximately 40,000 documents that were sent to HarbourVest by the Debtor during the Acis Bankruptcy, Seery admitted that he never reviewed it.

> Q     And you stated that you were unaware of the material that was sent over [to HarbourVest]?
>
> A     I think I testified that I didn't receive the 40,000 documents that were mentioned.
>
> Q     Did you do any search or order a search of the Highland server to see what material was sent over by any party to HarbourVest to analyze what – what information they had available to them and what was provided to them?
>
> A     Yes, we did a search.
>
> Q     And did you review the documentation that was sent over?
>
> A     The – the documentation that we looked at was very specific to the investment and to the OM.  So we didn't look for the – the supposed 40,000 documents, no.
>
> Q     Did you look for the material that was provided to them during the Acis bankruptcy and the periodic meetings that you discussed?  Or that you testified to earlier?
>
> A     The answer is no.[3]

Another defense of the Debtor to the HarbourVest Claims is the potential subordination of the HarbourVest Claims under section 510 of the Bankruptcy Code, which provides that "a claim . . . for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal to the claim or interest represented by such security."  11 U.S.C. § 510(b).  This only got a passing mention in Seery's testimony.  *See* Transcript at p. 51, lns. 5–6; ROA Vol. 9, p. 2079.

---

[3] Transcript at p. 91; ROA Vol. 9, p. 2119.

On January 21, 2021, the Bankruptcy Court entered an Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith. [ROA, Vol. 1, p. 9]

### III.        SUMMARY OF ARGUMENT

The Bankruptcy Court abused its discretion by approving the settlement between the Debtor and HarbourVest because HarbourVest failed to show that it had property considered the probabilities of ultimate success in litigation; inflated the projected expense and duration of litigation; failed to support its calculation of the interest the estate was receiving from HarbourVest or how that interest would benefit the estate when that interest, under the terms of the settlement, can be directed to any entity that the Debtor chooses; and failed to justify the apparent vote buying nature of the settlement (i.e. the requirement that HarbourVest vote all of its claims in favor of the Plan).

The testimony presented at the January 14, 2021, hearing shows that the Debtor failed to sufficiently investigate what HarbourVest knew or should have known at the time of its investment in HCLOF and during all relevant times following.  It also appears that the Debtor gave too much credence to HarbourVest's claimed amount for its claim.  There is no explanation as to why the subordination defense under section 510 of the Bankruptcy Code was not pursued.  There is no support or explanation as to how the $22 million value of the HCLOF interests being acquired by the Debtor (or whatever entity it ultimately chooses) was calculated or how that interest will ultimately benefit the estate given that it can be directed outside of the estate if the Debtor so chooses.  Nor is there any explanation provided as to justify the blatant vote buying nature of the settlement.

While the Debtor is entitled to some deference for its business judgment, it still must at least make some showing beyond self-serving and conclusory statements as to how the selected course of action will benefit the estate more than pursuing the defenses that Seery conceded were available. "The Court can not simply accept the [debtor's] word that the settlement is reasonable, nor may he merely 'rubber-stamp' the [debtor's] proposal."[4]

## IV.     ARGUMENT

The law relative to approval of motions pursuant to Bankruptcy Rule 9019 is well settled. The settlement must be fair and equitable.[5]   The factors the Court should consider are the following:

(i)     the probabilities of ultimate success should the claim be litigated;

(ii)     the complexity, expense, and likely duration of litigating the claim;

(iii)     the difficulties of collecting a judgment rendered from such litigation; and,

(iv)     all other factors relevant to a full and fair assessment of the wisdom of the compromise.[6]

### A.     The Settlement Inflates HarbourVest's Probability of Success and Discounts the Debtor's Defenses

There are numerous issues with HarbourVest's Claims, many of which Seery himself acknowledged under oath.  First, the $15 million in legal fees being sought by HarbourVest for litigation arising out of the Acis bankruptcy was shown to be *double* of what it would actually be entitled to even assuming that it was entitled to anything at all.  As both Seery and Pugatch noted,

---

[4] *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008) (quotations omitted).

[5] *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

[6] *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).

HarbourVest only acquired a 49.98% interest in HCLOF.  As such, it would only be entitled to 49.98% of $15 million in legal fees claimed.

Further, the Debtor's 9019 Motion argues that the settlement would "avoid the litigation risk associated with HarbourVest's $300 million claim."  While HarbourVest claims $300 million in damages, the majority of those damages are attributable to treble damages related to the RICO claim.    Yet, Seery testified that "Although in this case certainly somebody could lay out the predicate acts and put forth a RICO-type argument, we just didn't think that that had real merit in this commercial dispute, even with a fraud claim."[7]  In other words, even under the worst case scenario, the Debtor did not truthfully believe that HarbourVest had a $300 million claim, which raises questions over the $80 million in claims granted to HarbourVest in the settlement and how that could be considered to be in the best interest of the creditors.

Seery's principal explanation as to what were the Debtor's perceived weaknesses with its defenses was that: a) the Bankruptcy Court did not like their witnesses;[8] and b) that the operating memorandum produced by the Debtor was deficient.[9]  Yet, by his own admission, he never even examined the production that was provided to HarbourVest in connection with the CLOs and the Acis Bankruptcy; production which potentially could prove that HarbourVest could not reasonably rely on any alleged misrepresentations or omissions by the Debtor.  On the stand, Mr. Seery was explicit with respect to what defenses the Debtor considered in opposition to the HarbourVest Claims, principally that HarbourVest was aware of the risks involved in the investment, was aware

---

[7] Transcript at p. 50, lns. 1–4; ROA Vol. 9, p. 2078.

[8] *Id.* at p. 46, lns. 15-21; ROA Vol. 9, p. 2074.

[9] *Id.* at p. 47, lns. 16–17; ROA Vol. 9, p. 2075.

of the dispute with the former manager of the CLOs, Mr. Joshua Terry, which was the trigger for the Acis bankruptcy that HarbourVest participated in, and chose to go along with it nonetheless.

Significantly, even if the Bankruptcy Court does doubt the credibility of the Debtor's principal, the issue of what *HarbourVest* knew or should have known would be dependent largely on *HarbourVest's* agents, not the Debtor's principal, thereby mooting the concern over the credibility of the Debtor's witnesses, or at the very least reducing the impact of that perceived issue.

Seery testified that HarbourVest's position was "[b]ut for the fraud, they wouldn't have made the investment."[10]  An essential element of proving a fraud claim is to show that the claimant reasonably or justifiably relied on the alleged fraudulent representation or omission.[11]  Yet, it does not appear that a proper analysis of this element was done prior to the Debtor categorically concluding that the settlement was in the best interest of the creditors due to the litigation risk.  If the documents that were produced to HarbourVest were never even examined, how could the Debtor possibly know the strength of its defense that HarbourVest was aware of the various risks with HCLOF prior to the settlement?

Lastly, it is clear that a proper investigation into subordinating the HarbourVest Claims under 11 U.S.C. § 510 was either never conducted or was ignored.  Under section 510 of the Bankruptcy Code, a claim based on the purchase of a security can be subordinated.  The HarbourVest Claims are facially based on HarbourVest's purchase of its interest in the CLO

---

[10] Transcript at p. 92, lns. 23–24; ROA Vol. 9, p. 2120.

[11] *Highland Crusader Offshore Partners LP v. LifeCare Holdings Inc.*, 377 F. App'x 422, 428 (5th Cir. 2010) ("Justifiable or reasonable reliance is an element of both fraud and negligent misrepresentation.").

backed securities held by HCLOF.  That this defense only received a passing mention also merits raised skepticism about the settlement.

Settlement requires a more thorough examination of claims and defenses than was conducted here.  In order to ensure that a sufficient evaluation has been conducted, courts want to ensure that the parties have access to sufficient information to evaluate the case properly and assess the adequacy of the settlement.[12]  In the *Schapiro* case, the court was satisfied on this front because of the fact that both sides had thoroughly reviewed thousands of documents and had conducted their own investigations into the merits of the claims:

> By the time the Settlement was reached. Plaintiffs' Co–Lead Counsel had thoroughly analyzed the possible legal claims against JPMorgan and the substantial legal and factual defenses raised by JPMorgan. In addition, as further described at ¶¶ 34–36 of the Joint Final Approval Declaration, Plaintiffs' Co–Lead Counsel reviewed and analyzed over a million pages of documents produced by JPMorgan and interviewed numerous JPMorgan senior executives, in order to fully understand and evaluate the relationship between JPMorgan and Madoff, and the quantum of evidence that exists concerning JPMorgan's alleged role in Madoff's Ponzi scheme. Co–Lead Counsel also had the benefit of the discovery record generated in the Trustee's proceeding related to Madoff, and held detailed collaborative discussions with the Trustee's professionals who had conducted their own exhaustive investigation of potential claims against JPMorgan. Furthermore, Co–Lead Counsel, themselves, conducted detailed interviews with numerous important JPMorgan senior executives who had not previously been examined by the Trustee. As a result, the court is satisfied that plaintiffs have a full understanding of the strengths and weaknesses of possible claims against JPMorgan and the difficulties they would encounter in this litigation.[13]

Nothing near that level of diligence and investigation has been conducted here.

---

[12] *Shapiro v. JPMorgan Chase & Co.*, No. 11 CIV. 7961 CM, 2014 WL 1224666, at *9 (S.D.N.Y. Mar. 24, 2014).

[13] *Id.* at *10.

**B.     The Settlement Constitutes an Impermissible Gerrymandering of the Debtor's Plan in an Attempt to Purchase Votes**

Section 1122 of the Bankruptcy Code requires that all claims be placed in classes that are "substantially similar to the other claims or interests of such class."[14]   According to the Fifth Circuit, "[p]roper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly."[15]   The court continued: "substantially similar claims, those which share common priority and rights against the debtor's estate, should be placed in the same class."[16]   More to the point, without the requirement that all similar claims be classified together, "nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class."[17]

The very scenario that the Fifth Circuit has expressly stated should be avoided is what is permitted by this settlement.  The settlement not only bifurcates the HarbourVest Claims into two classes, but further requires that both claims vote in favor of the plan.  This is not just a gerrymandering of the confirmation votes, but it is a blatant purchase of those votes in exchange for $80 million in claims that, as stated above, were never properly examined for defenses.

**C.     There is Ambiguous (if any) Benefit to the Estate**

Another significant factor that was overlooked by the Bankruptcy Court is the fact that the return of the HarbourVest interest in HCLOF may not even go to the estate.  "The material value provided to the estate is an important factor to consider when evaluating a compromise."[18]   The

---

[14] 11 U.S.C. § 1122(a).

[15] *In re Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir. 1991).

[16] *Id.* at 1278.

[17] *Id.* at 1279 (quoting *In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir. 1986).

[18] *In re Roqumore*, 393 B.R. 474, 482 (Bankr. S.D. Tex. 2008).

settlement allows the Debtor to direct to which entity the HCLOF interest (purportedly valued at $22 million) will go.  This is concerning because the HCLOF interest may not even end up with the Debtor and may ultimately end up outside of the jurisdiction of the Bankruptcy Court and free from scrutiny.  Without the oversight of the Bankruptcy Court, the United States Trustee, and all other interested parties (including, but not limited to, the Debtor's numerous creditors), the return of the HCLOF interest can be subverted from actually benefiting the estate (one of the principal requirements for any settlement approval), making any claimed benefit purely "illusory."[19]

## V.    CONCLUSION

As the above demonstrates, there was little to no investigation on the part of the Debtor as to the likelihood that HarbourVest would be successful in its claims and the strength of the Debtor's defenses to the HarbourVest Claims, including a defense under section 510 of the Bankruptcy Code.  Further, there was not a proper weighing of cost/benefit to the estate given the fact that the Debtor is giving HarbourVest a total of $80 million in claims when the Debtor's defenses would primarily involve a review of documents already provided to HarbourVest and a review of what was already public knowledge with respect to HCLOF at the time of HarbourVest's investment—a process that would likely cost must less than $80 million and could reduce the HarbourVest Claims significantly, if not eliminate the claims entirely.  Lastly, the proposed settlement is a clear impermissible gerrymandering of votes and vote solicitation.  By splitting HarbourVest's Claims into two classes and requiring HarbourVest to vote in favor of the plan, the Debtor is attempting to manufacture the votes necessary to confirm its plan.

---

[19] *Id.* at 481 (finding the cash surrender of two insurance policies valueless and of no benefit to the estate).

Examining all of these factors together shows that the Bankruptcy Court abused its discretion in approving the 9019 Motion of the Debtor. As such, the Appellants respectfully request that this Court overturn the Bankruptcy Court's Order and hold that:

a)  The Bankruptcy Court erred in finding that granting the Debtor's Motion For Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [ROA Vol. 1, p. 348] (the "<u>9019 Motion</u>") and finding that the 9019 Motion was in the best interest of the Debtor's estate, its creditors and other parties in interest;

b)  The Bankruptcy Court erred in finding that granting the 9019 Motion and approving the settlement agreement was fair and equitable; and

c)  The Bankruptcy Court erred in approving the settlement wherein the Debtor acquired assets from the settling party and pursuant to Bankruptcy Court authorization could place the assets to be acquired with Debtor funds outside of the estate.

## <u>CERTIFICATE OF COMPLIANCE</u>

In compliance with Rules 8014 and 8015, I hereby certify that:

1) This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 4237 words.

2) This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, version 2104 in size 12, Times New Roman.

Dated May 13, 2021:

<div style="margin-left:40%">

*/s/Douglas S. Draper*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Michael E. Landis, La. Bar No. 36542
mlandis@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Appellants*
*The Dugaboy Investment Trust and*
*The Get Good Nonexempt Trust*

</div>