Case No. 3:21-cv-00261-L

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

THE DUGABOY INVESTMENT TRUST and
GET GOOD NONEXEMPT TRUST,
**Appellants**,

v.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
**Appellee**.

On Appeal from the United States Bankruptcy Court for the
Northern District of Texas, Dallas Division
The Honorable Stacey G. Jernigan, United States Bankruptcy Judge

In re: Highland Capital Management, L.P.
Case No. 19-34054-sgj11 (Jointly Administered)

ANSWERING BRIEF OF APPELLEE
HIGHLAND CAPITAL MANAGEMENT, L.P.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone/Facsimile: (972) 755-7100

*Counsel for Appellee*

## CORPORATE DISCLOSURE STATEMENT

Appellee Highland Capital Management, L.P. is a limited partnership, the general partner of which is Strand Advisors, Inc., a privately held corporation.  No publicly held corporation owns 10% or more of the interests in either entity.

# **TABLE OF CONTENTS**

**Page No.**

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF ISSUE AND STANDARD OF REVIEW ..................................1

STATEMENT OF FACTS ........................................................................3

    A.  Summary ....................................................................................3

    B.  The Highland Bankruptcy Case ...................................................5

    C.  HarbourVest's Claims and Allegations ..........................................5

    D.  Settlement Discussions and Terms ..............................................12

    E.  Settlement Motion and Objections ..............................................14

SUMMARY OF ARGUMENT .............................................................24

ARGUMENT ...................................................................................26

    A.  The Bankruptcy Court Did Not Abuse its Discretion in Finding That the Settlement is Fair, Reasonable and in the Best Interests of the Estate .........26

    B.  The Bankruptcy Court Did Not Abuse its Discretion in Finding that the Settlement Does Not Constitute Gerrymandering or Vote Purchasing in Connection With the Plan .............................................................31

    C.  The Benefit to the Estate is Not "Ambiguous" or Non-Existent ..................32

CONCLUSION ....................................................................................32

CERTIFICATE OF COMPLIANCE WITH RULE 8015......................................34

# TABLE OF AUTHORITIES

**Page No.**

## CASES

*Gibson v. Speier (In re Gibson)*,
No. CC-11-1028-MkKiD, 2011 Bankr. LEXIS 4341 (B.A.P. 9th Cir. Aug. 3, 2011) ..............................................................................................................27
*Grigson v. Creative Artists Agency, L.L.C.*,
210 F.3d 524 (5th Cir. 2000) .................................................................................2
*In re Acis Capital Management GP, LLC*,
Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) .............................................9
*In re Acis Capital Management, L.P.*,
Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) .............................................9
*In re Acis Capital Mgmt., L.P.*,
584 B.R. 115 (Bankr. N.D. Tex. 2018) ..............................................................10
*In re Age Ref. Inc.*,
801 F.3d 530 (5th Cir. 2015) ...............................................................................26
*In re Flight Transp. Corp. Sec. Litig.*,
730 F.2d 1128 (8th Cir. 1984) .............................................................................27
*In re Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ...................................................................................1
*Neutra, Ltd. v. Terry (In re Acis Capital Mgmt., L.P.)*,
604 B.R. 484 (N.D. Tex. 2019) .....................................................................2, 27
*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*,
119 F.3d 349 (5th Cir. 1997) ...............................................................................26
*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414, 88 S. Ct. 1157 (1967) ...................................................................27

## STATUTES

11 U.S.C. § 510.............................................................................. 16, 29, 30
11 U.S.C. § 510(b) ................................................................................3, 30

## RULES

Fed. R. Bankr. P. 9019 ............................................................................32

Appellee Highland Capital Management, L.P. ("Highland" or the "Debtor") hereby submits its Answering Brief to the Opening Brief of Appellants The Dugaboy Investment Trust and Get Good Nonexempt Trust (the "Trusts" or "Appellants") in respect of their appeal from the *Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* (the "Settlement Order") (R. 0009) entered by the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on January 21, 2021 in the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case").

## STATEMENT OF ISSUE AND STANDARD OF REVIEW

The issue on appeal is whether the Bankruptcy Court abused its discretion in approving the settlement agreement and release (the "Settlement") between Highland, on the one hand, and HarbourVest 2017 Global Fund L.P., Harbourvest 2017 Global AIF L.P., Harbourvest Dover Street IX Investment L.P., HV International VIII Secondary L.P., Harbourvest Skew Base AIF L.P., And Harbourvest Partners L.P. (collectively, "HarbourVest"). *In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) (settlement approval reviewed for abuse of discretion).

"To constitute an abuse of discretion, the [bankruptcy] court's decision must be either premised on an application of the law that is erroneous, or on an

1

assessment of the evidence that is clearly erroneous." *Neutra, Ltd. v. Terry (In re Acis Capital Mgmt., L.P.)*, 604 B.R. 484, 506 (N.D. Tex. 2019) (quoting *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)).  "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.  If the trier of fact's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it. . . .  The bankruptcy judge's unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected.  A reviewing court may assume that the trial court made an implied finding consistent with its general holding so long as the implied finding is supported by the evidence." *Id.* (internal citations and quotation marks omitted).

The issues and standard of review are not, as Appellants attempt to reframe them in their Issues 1 and 2, whether the Bankruptcy Court "erred" in "finding that the 9019 Motion was in the best interests of the Debtor's estate, its creditors and other parties in interest," or whether it "erred in finding that granting the 9019 Motion and approving the settlement agreement was fair and equitable." Appellants' Br. at 2.  There is no discrete issue on appeal as to whether a settlement may be approved "wherein the Debtor acquired assets from the settling party and . . . place[d] the assets to be acquired outside of the estate" (Issue 3), a

construct that both mischaracterizes the Settlement and is subsumed by the broader standard governing approval of settlements. Finally, there is no issue on appeal as to whether HarbourVest's claims should have been subordinated to claims of all other creditors pursuant to 11 U.S.C. § 510(b) (Issue 4), as there was no ruling on any such issue.

## STATEMENT OF FACTS

### A.  Summary

The Settlement resolves claims by HarbourVest against the Debtor's estate arising from its investment of approximately $80 million (the "Investment") to acquire a 49.98 percent ownership interest in an entity holding collateralized loan obligations ("CLOs"), now known as Highland CLO Funding ("HCLOF"). HCLOF was formerly known as Acis Loan Funding, Ltd. ("ALF") and managed by a Highland subsidiary, Acis Capital Management, L.P. ("Acis"), under a portfolio management agreement (the "ALF PMA").

Acis was litigating against a former portfolio manager, Joshua Terry. After Mr. Terry received an $8 million arbitration award, Highland, under the direction of James Dondero, allegedly stripped Acis of assets, including by transferring the ALF PMA to Highland and "rebranding" ALF as HCLOF.

Acis was placed into an involuntary bankruptcy and the Honorable Stacey G. C. Jernigan, who presided over both the Acis and Highland bankruptcy cases,

ruled after evidentiary hearings that, among other things: (a) the ALF PMA and other transfers would likely be deemed intentionally fraudulent; (b) the transfer of the ALF PMA would be enjoined and a trustee for Acis would be appointed (placing the Investment under the control of a bankruptcy trustee rather than Highland); and (c) Highland's witnesses (the same persons central to a defense against HarbourVest's claims) lacked credibility.

HarbourVest contends that it was fraudulently induced into making the Investment, alleging that Highland: (1) failed to disclose that it never intended to pay the arbitration award, (2) failed to disclose the fraudulent transfers and misrepresented the reasons for changing the portfolio manager immediately prior to the Investment, (3) falsely indicated that the dispute would not impact investment activities, and (4) improperly expressed confidence in the ability of HCLOF to reset or redeem the CLOs under its control. HarbourVest seeks rescission and damages in excess of $300 million based on various fraud theories, breach of fiduciary duty (under Guernsey law, a "loser pays" jurisdiction), state securities laws, and the Racketeer Influenced Corrupt Organization Act ("RICO").

As described herein, the Settlement has a net cost to the estate of less than $16.8 million, an excellent result that was appropriately approved after an evidentiary hearing in which the background and merits of the Settlement were thoroughly reviewed.

**B.**     **The Highland Bankruptcy Case**

On October 16, 2019, Highland filed a voluntary chapter 11 petition in the District of Delaware bankruptcy court, which was transferred on December 4, 2019 to the Bankruptcy Court.  To avoid appointment of a chapter 11 trustee, Mr. Dondero agreed to cede management control and in furtherance thereof, Highland filed a *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* on December 27, 2019, approved by order entered January 9, 2020.  (R. 2067).  Pursuant thereto, an independent board of directors (the "Independent Board") was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.  (R. 2067).  The members of the Independent Board are John S. Dubel, James P. Seery, Jr., and the Hon. Russell Nelms.  (*Id.*).

On July 16, 2020, the Bankruptcy Court entered an order appointing James P. Seery, Jr., as Highland's chief executive officer, chief restructuring officer, and foreign representative.  (R. 2067).  Mr. Seery, who provided extensive testimony in support of the Settlement, is a thirty-year restructuring lawyer with considerable experience with high-yield and distressed investing, which is Highland's business.  (R. 5132-33).

**C.**     **HarbourVest's Claims and Allegations**

On April 8, 2020, HarbourVest filed six proofs of claim against Highland

(Claim Nos. 143, 147, 149, 150, 153, and 154, referenced collectively as the "HarbourVest Claims").   (R. 2202-2255).   The proofs of claim recite that HarbourVest suffered significant harm due to conduct undertaken by Highland and its employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy Case that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise adversely impacted HCLOF's activities [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  (*See, e.g.,* R. 2207).

HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with [the various HCLOF-related agreements] and any and all legal and equitable claims or causes of action relating to the forgoing harm."  (*Id*.).

Highland objected to the HarbourVest Claims (the "Claim Objection") (R. 2256).  HarbourVest responded to the Claim Objection with a fulsome factual and legal analysis further supporting its claims.  *See Harbourvest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F)*

*Insufficient-Documentation Claims* (R. 2279-2899) (the "HarbourVest Response").[1]  Many foundational facts have already been adjudicated in decisions such as *In re Acis Capital Mgmt., L.P.*, 584 B.R. 115 (Bankr. N.D. Tex. 2018) and other unpublished decisions of record.

HarbourVest alleges that at the time it made its Investment, Acis and its parent, Highland, were embroiled in an arbitration with Mr. Terry, a former Highland employee and limited partner of Acis.  Through Acis, Mr. Terry managed Highland's CLO business, including CLO-related investments held by ALF.  The litigation began in 2016 after Highland terminated Mr. Terry and sued him in Texas state court.  Mr. Terry counterclaimed for wrongful termination and for the wrongful taking of his ownership interest in Acis and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.  (R. 543).

HarbourVest alleges that Highland had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude" Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Highland-related entities.  These included, on October 27, 2017, transferring Acis's portfolio

---

[1] The allegations are also summarized in its *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* (R. 537-562) (the "HarbourVest Reply").

management rights for ALF (*i.e.*, the ALF PMA) to Highland HCF Advisor, Ltd. and changing the target fund's name from ALF to HCLOF.    (R. 543-44; evidentiary references omitted).

HarbourVest alleges that on October 26, 2016, around the time that Highland informed HarbourVest about the Arbitration Award, Highland explained it was making these changes due to "reputational harm" that the Arbitration Award caused to Acis.    (R. 550).    Highland informed HarbourVest that, in lieu of redemptions, it was necessary to reset the CLOs underlying the HCLOF investment, and it would be easier to reset under the Highland CLO brand than the Acis CLO brand.    It did not reveal that Highland was using HCLOF as part of its scheme to avoid paying the Arbitration Award (which HarbourVest alleges clearly would have threatened to, and in fact did, complicate the ability to reset or redeem).    (R. 544).    HarbourVest was not told that these changes were part of Highland's broader campaign to strip Acis of assets, which HarbourVest alleges would be highly relevant, if not crucial, to any investor's decision.    (*Id*.). HarbourVest closed on its Investment in HCLOF on November 15, 2017, allegedly unaware of the fraudulent transfers or the true purposes of the changes to Acis, and in reliance on representations made by the Debtor.    (R. 545).

The HarbourVest Response alleges further (at R. 2285 *et seq*.) that:

- Highland and its employees, including its general counsel, Scott Ellington, misled HarbourVest as to the intent and true purpose of these restructurings and

led HarbourVest to believe that Mr. Terry's claims against Acis were meritless and a simple employment dispute that would not affect HarbourVest's investment;

- Highland and its employees, including Mr. Ellington, misled HarbourVest about its intentions with respect to the Arbitration Award and orchestrated the Transfers to denude Acis of assets and make it judgment proof;

- Highland, through Mr. Dondero, improperly exercised control over or misled HCLOF's Guernsey-based board of directors to cause HCLOF to engage in unnecessary, unwarranted, and resource-draining litigation against Acis;

- Highland improperly caused HCLOF to pay substantial legal fees of various entities in the Acis bankruptcy that were unwarranted, imprudent, and not properly chargeable to HCLOF; and

- Highland used HarbourVest as a scapegoat in its litigation against Acis by asserting that Highland's improper conduct and scorched-earth litigation strategy was at HarbourVest's request, which was untrue.

On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis and its general partner, Acis Capital Management GP, LLC[2] (together, the "Acis Bankruptcy Case").  HarbourVest alleges that Highland falsely attempted to shift blame for the Acis transactions to HarbourVest, and that Highland-affiliated witnesses and filings falsely claimed to the Bankruptcy Court that (i) HarbourVest invested in HCLOF only on the condition that Acis would not have anything to do with the CLOs going forward; (ii) that HarbourVest would demand its money back if a reset transaction was done with Acis; (iii) that HarbourVest said, with absolute certainty, that it had no interest in doing business with Acis

---

[2] *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018).

because the Acis brand was toxic, and demanded that Highland "get rid of Acis"; and (iv) that HarbourVest could "dictate the terms of any reset transactions" involving the HCLOF CLOs.  (R. 545-46; evidentiary references omitted).

Judge Jernigan granted Mr. Terry's petition for relief *and* appointed a trustee to replace Mr. Dondero's management.  *In re Acis Capital Mgmt., L.P.*, 584 B.R. 115 (Bankr. N.D. Tex. 2018) (R. 395).  The decision expresses strong views on the fraudulent intentions behind the transfers of Acis's assets and the lack of credibility of Highland's witnesses:

> The court found the testimony of Mr. Terry to be very credible. . . . The court also finds that Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort to denude the Alleged Debtors of their assets and value (i.e., transferring assets and rights for less than reasonably equivalent value), which started with intensity after issuance of the Arbitration Award (if not sooner).
>
> The court found the testimony of almost all of the witnesses for the Alleged Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey plausible deniability. . . .   Mr. Dondero . . . testified that he had never even read the Arbitration Award. . . .   [T]his court simply does not believe that he never read the Arbitration Award. The court perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous. . . .   [I]t strains credulity to suggest Mr. Dondero never even read the Arbitration Award.
>
> *  *  *
>
> Again, there was a lot of plausible deniability at Trial as to the "whos" and "whys" for the recent maneuverings involving the Alleged Debtors' assets and rights in the weeks since the

> Arbitration Award.  The one thing that the court was wholly
> convinced of was that conflicts of interest among Highland and
> the Alleged Debtors abound, and no one is looking out for the
> interests of the Alleged Debtors as a fiduciary should.

*Id*. at 131-32.  The Bankruptcy Court upheld the involuntary filing and concluded

that a "trustee appears necessary to halt the post-Arbitration Award transactions

and transfers of value out of Acis LP. . . ."  *Id*. at 149-50.

Among other things, HarbourVest alleges that it incurred significant legal

fees defending itself when the Acis Trustee investigated the false accusations of its

involvement.  (R. 545-46; evidentiary references omitted).  Furthermore, Highland

used HCLOF to finance its legal fees, at a cost of over $7.5 million to HarbourVest

on account of its 49.9% ownership interest in HCLOF.  (*Id*.)

During the Acis Bankruptcy Case, the Acis trustee objected to repeated

efforts by Highland to effect optional redemptions or otherwise liquidate the Acis

CLOs, and obtained injunctive relief from the Bankruptcy Court, including a TRO

granted on May 31, 2018 and a Preliminary Injunction granted on July 10, 2018.

(R. 3173).  That injunction was continued in effect under a chapter 11 plan of

reorganization (the "Acis Plan") confirmed on January 31, 2019.  (R. 3150, 3172).

The Bankruptcy Court stated that the evidence was "rather startling" that Highland

*orchestrated a systematic transfer of value away from the Debtor-Acis to other*

*Highland entities*.  (R. 3168-69; emphasis in original), and expressly found that

Acis had a substantial likelihood of success on its intentional fraudulent transfer

claims.   (R. 3177) ("The evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor.").

HarbourVest alleges that it incurred significant legal fees defending itself when the Acis trustee investigated the false accusations of its involvement, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.   (R. 546). Furthermore, Highland used HCLOF to finance its legal fees, at a cost of over $7.5 million to HarbourVest on account of its 49.9% ownership interest in HCLOF. (*Id.*)

The HarbourVest Claims seek rescission of the Investment and claim damages in excess of $300 million based on claims asserted under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), state and federal securities law claims (collectively, the "Securities Claims"), violations of RICO, breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law.

D.    **Settlement Discussions and Terms**

On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for*

*Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Pla*n [Docket No. 1207] (the "3018 Motion").   The 3018 Motion requested temporary allowance of the HarbourVest Claims for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

Discussions in October concerning the 3018 Motion broadened in November into discussions concerning a global resolution of the HarbourVest Claims.   In addition to maximizing its recovery, HarbourVest sought to extricate itself from the Investment.   Spirited exchanges of perspectives on the facts and law over a series of conference calls and direct, arms-length negotiations between principals resulted in a settlement with the following material terms:

- HarbourVest transfers its entire interest in HCLOF to a wholly-owned subsidiary of the Debtor.

- HarbourVest receives an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan.

- HarbourVest receives a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan.

- HarbourVest supports confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan.

- The HarbourVest Claims are allowed in the aggregate amount of $45 million for voting purposes.

- The parties exchange mutual releases.

(R. 367-385).

The Settlement has an effective value of $16.8 million, and probably less. First, based on an estimated recovery for general unsecured creditors of 87.44%, the recovery on the $45 million general unsecured claim would be approximately $39.3 million.  As the Debtor disclosed at the time, that value is actually less, because the 87.44% projection assigned no dollar amount to substantial disputed claims that were subsequently settled.[3]  Second, the allowed, subordinated claim of $35 million will have value only if general unsecured claims are paid in full, which depends upon speculative litigation recoveries.  Third, offsetting the foregoing, HarbourVest is relinquishing its 49.98% interest in HCLOF, which was estimated at the time the Settlement was reached to be worth approximately $22.5 million. Thus, HarbourVest's estimated recovery on its general unsecured and subordinated claims was estimated at no more than $16.8 million based on assumptions that were predicted to result in a lesser recovery.  (R. 507, 517-18; 2067-2071).

E.   **Settlement Motion and Objections**

On December 23, 2020, the Debtor filed its *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150,*

---

[3] Specifically, as the Debtor explained in response to the objections (at R. 517-18), the 87.44% estimated recovery was based on projections filed with the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, that assumed such a recovery "*only if* the claims of UBS, HarbourVest, Integrated Financial Associates, Inc., Mr. Daugherty, and the Hunter Mountain Investment Trust were zero." (R. 517-18 (emphasis in original)).  "Because those matters are being settled for amounts greater than zero, that assumption is proving to be inaccurate." (R. 518).  Furthermore, because the subordinated claims are junior to the general unsecured claims, their value is zero unless general unsecured claims receive 100% distributions. (*Id.*).  As such, assuming a $22.5 million value for the HCLOF interests, as was estimated at the time the Settlement was reached, the actual recovery to HarbourVest will be less than $16.8 million.  (*Id.*)

*153, 154) and Authorizing Actions Consistent Therewith* and supporting documents (the "Settlement Motion").  (R. 348-449).

None of the major parties-in-interest or creditors (the Official Unsecured Creditors' Committee, the Redeemer Committee, Acis, Patrick Daugherty, or UBS) objected to the Settlement Motion. Objections were filed only by Mr. Dondero (R. 466), Appellants (Mr. Dondero's family trusts) (R. 481) and CLO Holdco (a wholly-owned subsidiary of Mr. Dondero's Charitable Donor Advised Fund, L.P. (the "DAF") that owns approximately 49% of HCLOF).  (R. 491).  Mr. Dondero and his related entities have opposed virtually all efforts by the Debtor to resolve this case, including the Debtor's settlement with Acis [Docket No. 1087] and seven separate objections filed by Mr. Dondero and his related entities to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[4]

Appellants objected on three bases: (1) the Settlement represented a radical

---

[4] (1) *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661]; (2) *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust, The Dugaboy Investment Trust) [Docket No. 1667]; (3) *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon) [Docket No. 1669]; (4) *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund) [Docket No. 1670]; (5) *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization* (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC) [Docket No. 1673]; (6) *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]; and (7) *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization* (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank) [Docket No. 1676].

change in the Debtor's prior position as to the value of the HarbourVest Claims, and the supporting analysis placed too much weight on Highland's witnesses' lack of credibility; (2) the Settlement requires HarbourVest to support the Debtor's proposed plan and so "appears to be vote buying"; and (3) "[n]o information is provided as to whether the Debtor can acquire the interest in HCLOF, liquidate the interest, who will receive the interest, or how will the estate benefit from the interest to be acquired." (R. 485-86). There was no legal or factual exposition concerning these objections, and Appellants have virtually no economic interest.[5]

Mr. Dondero argued in material part that HarbourVest was attributing its damages to the injunctive relief granted by the Bankruptcy Court in the Acis Bankruptcy Case, rather than to Highland's conduct (R. 471-72), that it was Acis's mismanagement of the CLOs and/or market forces that produced HCLOF's losses (R. 473-74), that there was no contract between HarbourVest and Highland (R. 474), that the Settlement was an improper attempt to buy HarbourVest's plan support and the separate classification of its claim constituted plan gerrymandering

---

[5] Appellants (as well as Mr. Dondero and CLO Holdco) have only the most tenuous economic interest in the case and connection to the Settlement. Dugaboy and Get Good are Dondero "trusts" with only the most attenuated standing. Dugaboy has filed three proofs of claim [Claim Nos. 113; 131; 177]. In two of these claims, Dugaboy argues that (1) the Debtor is liable to Dugaboy for postpetition mismanagement of the Highland Multi Strategy Credit Fund, L.P., and (2) the corporate veil should be pierced to allow Dugaboy to sue the Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a Debtor-managed investment vehicle. In its third claim, Dugaboy asserts a claim against the Debtor arising from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the total limited partnership interests in the Debtor). Similarly, Get Good filed three proofs of claim [Claim Nos. 120; 128; 129] arising from its limited partnership interests in the Debtor. The Debtor believes that the claims are frivolous and has objected to them [Docket No. 906], and because they arise from an equity interest, the Debtor will seek to subordinate them under 11 U.S.C. § 510 at the appropriate time. As set forth above, these interests are out of the money and are not expected to receive any economic recovery. Nonetheless, the claims are technically extant.

(R. 475-77), and that the allowance of $80 million in claims was a "windfall" to HarbourVest.and the claims were inadequately tested because they had not been litigated (R. 477-78).  Like Appellants (his family trusts), Mr. Dondero also has virtually no financial interest in the Bankruptcy Case or the Settlement.[6]

CLO Holdco (the owner of approximately 49% of HCLOF) raised issues concerning the transferability of HarbourVest's interest in HCLOF, which objection was withdrawn at the hearing (R. 2036).

The Debtor's *Omnibus Reply* in support of the Settlement Motion (R. 506-527) responded in detail to each of these objections.  As set forth above, the Debtor explained that the actual recovery to HarbourVest was projected to be no more than $16.8 million, taking into account the projected value of the allowed $45 million general unsecured claim, the projected zero value of the $35 million subordinated claim, and the deduction for the estimated $22.5 million value of the HCLOF interest that was being transferred to the Debtor's designee.  (R. 507, 510,

---

[6] Mr. Dondero asserted in his Objection that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy.  While that claim is ostensibly true, it is tenuous at best.  On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."  More than nine months later, Mr. Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.  Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.  Mr. Dondero's claim as an "indirect equity security holder" is also a stretch.  Mr. Dondero holds no direct equity interest in the Debtor.  Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner.  Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests.  The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests.  The Class A interests are also junior to all other claims filed against the Debtor.  Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself.  Consequently, before Mr. Dondero can recover on his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be satisfied.

517-18).     The  Debtor  also  explained  that  there  was  no  vote  buying  or gerrymandering  in  support  of  the  proposed  plan,  for  the  simple  reason  that  the HarbourVest votes were not needed for confirmation, and it was hardly unusual for a party settling its claim to support the plan providing for its payment.  (R. 518-19).   The Debtor further explained that the HarbourVest Claims do not require a contract  with  Highland  and  are  not  based  on  mismanagement  by  Acis: "HarbourVest's  claims  are  that  it  invested  in  HCLOF  based  on  the  Debtor's fraudulent misrepresentations" *i.e.*, they sound in tort, not contract.  (R. 516).  (Put differently, it was Highland's undisclosed misconduct that exposed HCLOF to the alleged mismanagement in the first place.)  The Debtor pointed out that rebutting the  allegations  of  misrepresentations  would  require  the  testimony  of  witnesses whose  veracity  had  already  been  called  into  question  by  the  Bankruptcy  Court. (*Id.*).

As set forth above, the HarbourVest Response was also filed in response to the objections, which supplied extensive factual and legal support for its claims.

The Bankruptcy Court conducted an evidentiary hearing and heard argument on the Settlement Motion on January 14, 2021.  (R. 2029).   Mr. Seery testified for the Debtor in support of the Settlement Motion, as did HarbourVest's managing director, Michael Pugatch.  No witnesses testified in opposition to the Settlement Motion.

Mr. Seery testified at length concerning the Debtor's evaluation of the HarbourVest Claims. While the original proofs of claim were vague, HarbourVest had responded to the Claim Objection with a panoply of information. (R. 2053-54). Mr. Seery demonstrated a thorough understanding of the CLO business generally and HCLOF/ALF/Acis business specifically, and the facts surrounding the Investment. (R. 2056-59). He described the Acis-related transfers and assumed they would be deemed fraudulent. (R. 2059-60). He believed Highland's disclosure to HarbourVest concerning the Acis litigation in the Offering Memorandum was "totally inadequate." (R. 2065). He reviewed the economics of the Settlement. (R. 2067-72).

Mr. Seery evaluated the possible defenses. (R. 2973 *et seq.*):

> the factual predicate for our defense was going to be that we divulged these things to HarbourVest and that they did not reasonably -- it was -- reasonably rely on some failure to divulge because they're a sophisticated investor. The problem with that defense is that our witnesses, which really would have primarily been Mr. Dondero and Mr. Ellington, and one other employee who runs the CLO business, Mr. Covitz, would not be pretty good. They've been -- two of them have been in front of this Court and they're not viewed favorably and their testimony would be challenged and potentially suspect.

(R. 2074). He did not put much stock in the RICO claims (R. 2078), but observed that there was no genuine dispute that HarbourVest had lost over $50 million.

> [T]here's an argument, and we analyzed it thoroughly, that the injunction effectively caused a lot of the damages. Because if you look at the values of the equity that HarbourVest had, the -- and HCLOF had in the CLOs, it went down dramatically after the Trustee in the Acis case took over and then subsequently, when the case was reorganized and Mr. Terry took over, you know, with Brigade as the sub-advisor.
>
> Now, that would -- you know, we would -- we could certainly attempt to throw, in our defense, the causation at Mr. Terry's feet or at Mr. Phelan's feet. HarbourVest's retort is that none of this would have occurred but for the burn-it-down litigation that Mr. Dondero engaged in with Highland.
>
> In addition, in Mr. Terry's defense, you know, he did try multiple times with HCLOF, tried to petition, if you will, the HCLOF entity to -- and directors, former directors, to reset the CLOs to make them more economically viable, based upon the current level of asset returns versus the debt costs in the CLOs. And that was rejected by the HCLOF and the Debtor as the controlling party of HCLOF. So, we thought about those risks.

(R. 2081).

Mr. Seery noted that he was joined in the settlement decision by his co-directors, former bankruptcy judge Nelms and John Dubel, and that "[o]bviously, Mr. Nelms, from his -- both his practice and his time on the bench, has a keen insight into how to resolve and what the risks and benefits are from settling litigation." (R. 2086).

Mr. Seery testified that there was no vote buying or gerrymandering in order to obtain acceptance of the Plan by an impaired class of creditors, for the simple reason that there are already numerous classes of creditors that will vote for the Plan. (R. 2089).

Mr. Pugatch of HarbourVest testified as to the bases of the HarbourVest Claims, introducing evidence such as an email from Highland representing that "the [Terry] dispute has no impact on our investment activities. . . ." (R. 2132). He also testified that HCLOF had incurred $15 million of fees in connection with Acis, and that HarbourVest had been dragged into the Acis Bankruptcy Case due to Highland's misstatements that HarbourVest had played a role by instructing that structural changes be made. (R. 2138-9).

The Bankruptcy Court issued a bench ruling approving the Settlement, stating "I in all ways find this compromise to meet the required legal standard set forth in such cases as *TMT Trailer Ferry*, *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit cases. (R. 2179). The Bankruptcy Court found Mr. Seery and Mr. Pugatch to be credible, and that the negotiations were "hard-fought" and at arms-length. (*Id*.) It found "nothing sinister or improper about the fact that compromise includes a commitment of HarbourVest to vote in favor of the plan. Again, we see that a lot." (R. 2180).

> I find the compromise to meet the paramount interest of creditors here. Notably, we have very large creditors in this case who have not objected. The *Foster Mortgage* case from the Fifth Circuit tells me I am supposed to consider support or opposition of creditors. No opposition of UBS. No opposition of the Redeemer Committee Crusader Fund. No opposition from Josh Terry or Acis. No opposition from Daugherty.

*(Id.)*

The Bankruptcy Court found further that, "moreover, when considering the paramount interest of creditors, I find this compromise to be in all ways fair and equitable and in the best interest of the estate, and certainly within the range of reasonableness," observing that even if the $300 million total relied upon such theories as treble damages under RICO, HarbourVest nonetheless had invested $75-80 million for an interest now worth about $22 million. (R. 2181). The lesser amount of the compromise was "certainly fair and equitable and reasonable when considering the complexity and duration of further litigation, the risks and rewards, the expense, delay, and likely success." (*Id*.)

> A couple of last things I'm going to say are these. I understand, you know, there is vehement disagreement on the part of our Objectors to the notion that Highland might have caused a $50 million loss to HarbourVest. But I will tell you, for what it's worth -- I want the record clear that this is part of my evaluation of the reasonableness of the settlement -- my reaction is that, indeed, Highland's litigation strategy in the Acis case caused HCLOF to lose a huge portion of its value, to the detriment of HarbourVest. You know, whether all evidence at the end of the day would convince me of that, I don't know, but that's -- that is definitely this judge's impression.

> I'm very sympathetic to HarbourVest. It appears in all ways from the record, not just the record before me today, but the record in the Acis case that I presided over, that Highland back then would have rather spent HarbourVest's investment for HCLOF legal fees than let Josh Terry get paid on his judgment. They were perfectly happy to direct the spending of other people's money, is what the record suggested to me.

> And then, you know, I have alluded to this very recently, as recently as last Friday: I can still remember Mr. Ellington

sitting on the witness stand over here to my left and telling the Court, telling the parties under oath, that HarbourVest . . . was insistent that the Acis name was toxic, and so that's what all of this had been about: the rebranding, the wanting to extract or move things away from Acis.

So, you know, I have heard for the -- well, at least the second time today, from Mr. Pugatch, what I perceive to be very credible testimony that that's just not the way it happened. And I guess the last thing I want to say here today, and you know, I guess I have multiple reasons for saying this, not just in connection with approving the settlement, you know, I've heard about how the Acis CLOs, the HCLOF CLOs have lost, you know, a crazy amount of value, that they underperform in the market, that, you know, during the Acis/Brigade tenure and, you know, they should have been reset. You know, I hope those who have not been around as long as some of us in this whole saga know that the -- Mr. Terry, Mr. Phelan, I think Brigade, they all desperately wanted to reset these things, but it was HCLOF, I believe directed by Highland, that wanted to redeem, wanted to liquidate, take the pot of money, warehouse it, and then do their own thing.

And there was, I think, from my vantage point, a monumental effort to try to get everyone to the table to do reasonable resets that would be good for the stakeholders at HCLOF and be good for the creditors of Acis, including Josh Terry. That was always the balancing act that most of us were focused on during the Acis bankruptcy. But Highland, I believe, directing HCLOF's strategy, just did not want the resets to happen.

So, again, part of me, I suppose, just wants to make the record clear on something that I fear not everyone is clear about. And I say that because the comment was made that the injunctions, the preliminary injunctions sought by the Acis trustee caused the plummet in value, and I think that's just not an accurate statement. I think litigation strategies are what caused the plummet in value, and that's why I think ultimately HarbourVest would potentially have a meritorious claim here in a significant amount if this litigation were to go forward.

So, I approve this under 9019.

(R. 2181-84).

The Bankruptcy Court entered a corresponding Settlement Order, approving the Settlement based on:

> this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. . . .

(R. 011).

## SUMMARY OF ARGUMENT

The Bankruptcy Court did not abuse its discretion in approving the Settlement. So long as a bankruptcy court applies the correct standard, its decision to approve a settlement may not be disturbed unless the record fails to support it. Here, the Bankruptcy Court expressly applied the correct standard, and the record abundantly supported its decision.

HarbourVest had claims that it was defrauded into making its Investment in

HCLOF by means of numerous misrepresentations or non-disclosures by Highland concerning the existence, nature, purpose and effect of bad faith litigation machinations concerning Acis and Mr. Terry, claims that the Bankruptcy Court stated in no uncertain terms had merit. HarbourVest had incurred damages of $7.5 million in fees and a $50 million loss in value of its Investment, and had legal theories that might greatly increase those already substantial numbers. The claims were settled for an effective value of no more than $16.8 million. No significant creditors objected – only the architect of the destructive litigation approach, Mr. Dondero, and his family trusts, who have virtually no economic interest affected by the Settlement.

Although Appellants argue that the Settlement inflates HarbourVest's probability of success and discounts the Debtor's defenses, they offer virtually no analysis or authority to support it, much less any that would place the Settlement outside a reasonable range of compromise. Their second argument – that the Settlement constitutes gerrymandering or vote purchasing for plan confirmation purposes – is objectively frivolous inasmuch it was unnecessary for that purpose, was unsupported by a shred of evidence, and was properly and summarily rejected. And their third argument, made at the hearing and on appeal – that the benefit of the Settlement is illusory because the Debtor can place the HCLOF interests it is receiving outside of the estate – is also frivolous: the interests are to be held in a

wholly-owned subsidiary, *i.e.*, there is a dollar-for-dollar benefit to the estate.

The Settlement was an excellent outcome and its approval is beyond reproach. It is patently impossible on this record to form a "definite and firm conviction that a mistake has been committed." Accordingly, the Bankruptcy Court's decision should be affirmed.

## ARGUMENT

### A.   The Bankruptcy Court Did Not Abuse its Discretion in Finding That the Settlement is Fair, Reasonable and in the Best Interests of the Estate

A bankruptcy court may approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty of law and fact;

- complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the paramount interest of creditors with proper deference to their reasonable views."

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted).

A bankruptcy court is not required to make express findings on each factual or legal issue supporting its conclusion. Rather, if the record contains "adequate

facts to support the decision of the trial court to approve the proposed compromise, a reviewing court would be properly reluctant to attack that action solely because the Court failed adequately to set forth its reasons for the evidence on which they were based." *In re Flight Transp. Corp. Sec. Litig.,* 730 F.2d 1128, 1136 (8th Cir. 1984) *(quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 437, 88 S. Ct. 1157 (1967)).

Thus, as this Court previously observed, "[a] reviewing court may assume that the trial court made an implied finding consistent with its general holding so long as the implied finding is supported by the evidence." *Neutra, Ltd. v. Terry (In re Acis Capital Mgmt., L.P.)*, 604 B.R. at 506 (internal citations and quotation marks omitted).  *See also Gibson v. Speier (In re Gibson)*, No. CC-11-1028-MkKiD, 2011 Bankr. LEXIS 4341, at *16-18 (B.A.P. 9th Cir. Aug. 3, 2011) (so long as the correct standard is applied, the decision stands if the record supports it).

Here, the Bankruptcy Court stated the law precisely and correctly, and the record overwhelmingly supported it.  HarbourVest had substantial claims, arising from a factual context with which Judge Jernigan had extensive familiarity, having presided over the Acis Bankruptcy Case as well as the instant case.  As set forth above, Highland solicited its Investment in the CLOs held by ALF and managed by Acis, and represented that the litigation with Mr. Terry would have no material impact on the Investment.  Instead it undertook to strip Acis of assets, including

transferring the ALF PMA to a Highland entity, a course of action that landed Acis in an involuntary bankruptcy under the management of a chapter 11 trustee and an injunction against any Highland interference with the ALF PMA or management of the CLOs.  On top of that, Highland claimed falsely that HarbourVest had insisted on it.  Mr. Dondero and Highland's (prior) management had no credibility with Judge Jernigan.  And HarbourVest had incurred damages, namely its 50% share of the $15 million in fees paid by HCLOF, and a diminution of approximately $50 million in the value of its Investment.  The Settlement compromised these claims for an effective value of $16.8 million or less, and was supported by all persons with a financial interest therein.

Against this avalanche of supporting evidence, Appellants assert that great weight should have been placed upon a "reasonable reliance" defense, namely: "you're a sophisticated investor, and you should have been able to figure out that there was a significant risk that, with respect to Mr. Terry, that Mr. Dondero would not stop litigating and that those costs would put significant risk on the investment." (Br. at 6; R. 2074-75).  While Appellants are correct that this defense would not rely on the veracity of Highland's witnesses, it would likely fail.  The Bankruptcy Court would have to find that HarbourVest should reasonably have anticipated, based on Mr. Dondero's reputation for litigiousness, that he would respond to the Arbitration Award with a scheme to strip Acis of the ALF PMA and

other assets so aggressive as to embroil all parties in litigation and result in Highland losing management authority over the Investment. To the contrary, as noted above, the Bankruptcy Court stated quite firmly that it believed HarbourVest's claims to have merit.

As noted, the Bankruptcy Court also rejected the argument that Highland would not bear responsibility for HarbourVest's losses because they were attributable to mismanagement by the Acis chapter 11 trustee or to the injunction rulings. As HarbourVest argued, whether or not there was mismanagement, it would not have made the Investment in the first place but for the misrepresentations and nondisclosures. Furthermore, as quoted above, the Bankruptcy Court specifically found that Highland bore responsibility for any inability to manage the CLOs effectively.

Appellants argue that "[l]astly, it is clear that a proper investigation into subordinating the HarbourVest Claims under 11 U.S.C. § 510 was either never conducted or was ignored. Under section 510 of the Bankruptcy Code, a claim based on the purchase of a security can be subordinated. The HarbourVest Claims are facially based on HarbourVest's purchase of its interest in the CLO backed securities held by HCLOF. That this defense only received a passing mention also merits raised [sic] skepticism about the settlement." (Br. at 11).

Appellants offer no further argument as to how section 510 could apply,

because it plainly doesn't.  Section 510 provides that an equity purchaser cannot elevate its claim to that of a creditor by asserting a claim based on its purchase of a security.  Hence such claims "shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security. . . ."  11 U.S.C.  § 510(b).   The securities HarbourVest purchased in HCLOF do not represent any claim or interest in the Debtor.   HarbourVest's claims against Highland are tort claims and related claims based on alleged tortious conduct by Highland.  Section 510 did not warrant more than a "passing mention" because any such argument would be frivolous.

Appellants conclude that "[s]ettlement requires a more thorough examination of claims and defenses than was conducted here," quoting at length from a district court's opinion approving a class action settlement in pending litigation, in which a million pages of documents had already been reviewed and interviews conducted, thereby satisfying the court that "plaintiffs have a full understanding of the strengths and weakness of possible claims…."  (Br. at 12). The decision is utterly inapposite.  It says nothing about what level of investigation is required even in the context of a class settlement, much less in the context of settling a claim in a bankruptcy case.  Although it would clearly suit Mr. Dondero, there is no law that bankruptcy claims must be litigated in order to be settled. Appellants raise nothing whatsoever that would call into question the settlement

30

analysis presented to and approved by the Bankruptcy Court.

**B.** **The Bankruptcy Court Did Not Abuse its Discretion in Finding that the Settlement Does Not Constitute Gerrymandering or Vote Purchasing in Connection With the Plan**

Appellants argue briefly that "the Settlement constitutes an impermissible gerrymandering of the Debtor's Plan in an attempt to purchase votes" because it confers HarbourVest with $80 million of claims in two classes and requires that both be voted in support of the Plan. (Br. at 13). Even if this argument was legally cognizable as an objection to a settlement, rather than to confirmation of a plan, it holds no water. First and foremost, as Mr. Seery's uncontroverted testimony demonstrates, there is no objective basis for the argument, because the Debtor does not need HarbourVest's votes to confirm the Plan. As Mr. Seery testified, there are already multiple classes of creditors that will vote to accept the Plan (the point of plan "gerrymandering" being to manufacture a class of impaired class of creditors that will support a plan, as the Bankruptcy Code requires for certain purposes). Nor is there "vote-purchasing." As the Bankruptcy Court specifically found, there is "nothing sinister or improper about the fact that compromise includes a commitment of HarbourVest to vote in favor of the plan. Again, we see that a lot." (R. 2180). Finally, there was no evidence that the Debtor actually had any such intent; Mr. Seery's testimony that he did not have any such intent was uncontroverted.

**C.**   **The Benefit to the Estate is Not "Ambiguous" or Non-Existent**

Finally, Appellants complain that "[a]nother significant factor that was overlooked by the Bankruptcy Court is the fact that the return of the HarbourVest interest in HCLOF may not even go to the estate."  (Br. at 13-14).  This was an argument not specifically made until the hearing (R. 2178), and it was a non-issue. As noted, Mr. Seery explained that the Debtor's intention was to hold the HCLOF interests that are being relinquished by HarbourVest in a special purpose entity that would be wholly-owned by the Debtor.  "[F]rom a structural standpoint, we wanted to be able to put it into a subsidiary as opposed to putting it directly in [the Debtor].  If we couldn't do that, we would -- we would put it into [the Debtor]." (R. 2115).  By definition, an asset held in a wholly-owned subsidiary represents dollar-for-dollar value to the parent.  This conclusively answers any argument that there is no benefit to the estate.

## CONCLUSION

Approval of the Settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure was not an abuse of discretion.  Accordingly, the Bankruptcy Court's decision should be affirmed.

Dated:  June 14, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      jmorris@pszjlaw.com
      gdemo@pszjlaw.com
      hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 8015</u>

This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(ii) because, according to Microsoft Word, it contains 7,573 words, excluding the portions of the document exempted by Fed. R. Bankr. P. 8015(a)(7)(B)(iii).

By: *<u>/s/ Zachery Z. Annable</u>*
     Zachery Z. Annable